**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BELMONT ABBEY COLLEGE
100 Belmont-Mt. Holly Rd.
Belmont, NC 28012;
     *Plaintiff*,

v.

KATHLEEN SEBELIUS, Secretary
of the United States Department of
Health and Human Services,

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,

THOMAS PEREZ, Secretary of the
United States Department of Labor,

UNITED STATES DEPARTMENT
OF LABOR,

JACOB LEW, Secretary of the
United States Department of
the Treasury, and

UNITED STATES DEPARTMENT
OF THE TREASURY,
     *Defendants*.

Civ. Action No. _____

**COMPLAINT**

## VERIFIED COMPLAINT
### (TRIAL BY JURY DEMANDED)

Plaintiff Belmont Abbey College, by and through its attorneys, alleges and states as follows:

## NATURE OF THE ACTION

1.  This is a challenge to regulations issued under the 2010 Patient Protection and Affordable Care Act that force employee health insurance plans to provide free coverage of contraceptives, sterilizations, and drugs and devices that cause early abortions (the "Final Mandate").

2.  Plaintiff Belmont Abbey College is a private Catholic college founded and operated by Benedictine monks.  The College "finds its center in Jesus Christ."[1]  Belmont Abbey College is "guided by the Catholic intellectual tradition and the Benedictine spirit of prayer and learning," and its mission is "to educate students in the liberal arts and sciences so that in all things God may be glorified." *See id.*

3.  Consistent with traditional Catholic teaching on the sanctity of life and sexuality, Belmont Abbey College believes and teaches that abortion, sterilization, and the use of contraceptives to prevent pregnancy are morally unacceptable. Belmont Abbey College's religious convictions forbid it from participating in, paying for, designating others to pay for, training others to engage in, or otherwise supporting or facilitating access to, contraception, sterilization, or abortion.

4.  In light of these religious beliefs, Belmont Abbey College cannot participate in the government's regulatory scheme to promote, encourage, and subsidize the use of sterilization,

---

[1] *See* Belmont Abbey, President Home, Vision Statement, http://www.belmontabbeycollege.edu/ president/vision-statement.aspx (last visited Oct. 29, 2013).

contraceptives, and drugs and devices that cause abortions.  Under the Final Mandate, however, Belmont Abbey College faces millions of dollars in fines for this religious exercise.

5.   The government defendants have exempted thousands of plans, covering tens of millions of employees, from the Final Mandate.  These exemptions have been granted for a wide variety of reasons, from the purely secular exemption for plans in existence before a certain date ("grandfathered plans") to a narrow religious exemption for certain "religious employers."

6.   Despite its obvious religious nature, and despite the fact that Belmont Abbey College is still operated in part by an order of Benedictine monks, Belmont Abbey College does not qualify for any exemptions.  While "religious employers" are exempted, Defendants have limited that exemption to protect only "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." That is because, in the eyes of the government, the monks' work educating students in "the Catholic intellectual tradition and the Benedictine spirit of prayer and learning" is not an "exclusively religious activity."

7.   The regulations do offer Belmont Abbey College and other non-exempt religious organizations what the defendants have labeled an "accommodation." But the "accommodation" still requires Belmont Abbey College to play a central role in the government's scheme, because it must designate an agent to pay for the objectionable services on Belmont Abbey College's behalf, and it has to take steps to trigger and facilitate that coverage.  Belmont Abbey College cannot take these actions to facilitate this coverage without violating its religion.

8.   The supposed "accommodation" also continues to treat Belmont Abbey College as a second-class religious organization, not entitled to the same religious freedom rights as other

religious organizations, including any religious schools that are "integrated auxiliaries" of churches.

9. The "accommodation" also creates administrative hurdles and other difficulties for Belmont Abbey College, forcing it to seek out and contract with companies willing to provide the very drugs and services it speaks out against.

10. If Belmont Abbey College does not compromise its religious convictions and comply with the regulations, however, it faces severe penalties that could exceed $7.6 million each year.

11. By placing Belmont Abbey College in this impossible position, Defendants have violated the Religious Freedom Restoration Act, as well as the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment of the United States Constitution, The Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act.

12. Belmont Abbey College therefore respectfully requests declaratory and permanent injunctive relief.

## JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

14. Venue lies in this district pursuant to 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to the claim occurred in this District, and the Defendants are located in this District.

## **IDENTIFICATION OF PARTIES**

15. Plaintiff Belmont Abbey College is a private Catholic Benedictine College in Belmont, North Carolina. Founded by an order of monks in 1876, Belmont Abbey College finds its center in Jesus Christ and seeks to provide an educational environment in which the principles of Holy Scripture as taught by the Catholic Church are held up as an ideal.

16. Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

17. Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, she has responsibility for the operation and management of HHS. Sebelius is sued in her official capacity only.

18. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration and enforcement of the Mandate.

19. Defendant Thomas Perez is the Secretary of the United States Department of Labor. In this capacity, he has responsibility for the operation and management of the Department of Labor. Secretary Perez is sued in his official capacity only.

20. Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

21. Defendant Jacob Lew is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department. Secretary Lew is sued in his official capacity only.

22. Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

# FACTUAL ALLEGATIONS

**I.   Belmont Abbey College's Religious Beliefs and Practices Related to Insurance for Contraception, Sterilization, and Abortion.**

23. Belmont Abbey College is a small liberal arts school located outside of Charlotte, North Carolina.  It was founded in 1876 by a congregation of Benedictine monks, who built the campus with bricks they formed by hand from the red clay of the North Carolina soil.

24.  Today, the monastery operates in the center of campus, and the monks of the Abbey continue to live on Belmont Abbey College's campus and sponsor it. They provide significant financial support for Belmont Abbey College, and the monks also serve on the Board of Trustees that governs Belmont Abbey College. The head of the monastery, Abbot Placid Solari, serves as Belmont Abbey College's Chancellor, and other monks serve as teachers, administrators, and chaplains.

25. Faith is central to the educational mission of Belmont Abbey College. Belmont Abbey College describes itself as a Catholic Benedictine College that "finds its center in Jesus Christ" and is "led by St. Benedict's desire 'that in all things God may be glorified.'"[2]

26. Belmont Abbey College's purpose is expressed in its mission statement: "Our mission is to educate students in the liberal arts and sciences so that in all things God may be glorified. In this endeavor, we are guided by the Catholic intellectual tradition and the Benedictine spirit of prayer and learning. Exemplifying Benedictine hospitality, we welcome a diverse body of students and provide them with an education that will enable them to lead lives of integrity, to

---

[2] Belmont Abbey, President Home, Vision Statement, http://www.belmontabbeycollege.edu/president/vision-statement.aspx (last visited Oct. 29, 2013).

succeed professionally, to become responsible citizens, and to be a blessing to themselves and to others."[3]

27. Belmont Abbey College adheres to the Apostolic Constitution *Ex Corde Ecclesiae* of Pope John Paul II, which is the relevant law of the Roman Catholic Church for Catholic colleges and universities.[4]

28. *Ex Corde Ecclesiae* requires all Catholic universities to have among its "*essential characteristics* . . . fidelity to the Christian message as it comes to us through the Church." Accordingly, Belmont Abbey College strives to reflect "[f]idelity to the Christian message as it comes to us through the Church" in all aspects of its teaching.[5]

29. *Ex Corde Ecclesiae* also requires Catholic universities to reflect "[a] Christian inspiration . . . of the whole college community." *Id.* Accordingly, Abbot Placid interviews all prospective faculty members to discover how they will make Belmont Abbey College's vision of "find[ing] our center in Jesus Christ" apparent in their teaching, and how they will further Belmont Abbey College's mission of being a Catholic and Benedictine college. *Id.*

30. As a Catholic institution, Belmont Abbey College holds religious beliefs that include traditional Catholic teachings on the sanctity of life. Belmont Abbey College believes and teaches that each human being bears the image and likeness of God, and therefore that all human

---

[3]   Belmont Abbey College, Mission Statement, http://www.belmontabbeycollege.edu/visionstatement/mission-statement.aspx (last visited Oct. 29, 2013).

[4]   *See* Pope John Paul II, Apostolic Constitution on Catholic Universities (1990), http://www.vatican.va/holy_father/john_paul_ii/apost_constitutions/documents/hf_jp-ii_apc_15081990_ex-corde-ecclesiae_en.html.

[5]   Belmont Abbey College, Abbott Placid Solari, http://www.belmontabbeycollege.edu/chancellor/interview.aspx (last visited Oct. 29, 2013).

life is sacred and precious, from the moment of conception. Belmont Abbey College therefore believes and teaches that abortion ends a human life and is a grave sin.

31. Belmont Abbey College's religious beliefs also include traditional Catholic teaching on the nature and purpose of human sexuality. In particular, Belmont Abbey College believes, in accordance with Pope Paul VI's 1968 encyclical, *Humanae Vitae*, that human sexuality has two primary purposes: "uniting husband and wife in the closest intimacy" and "for the generation and rearing of new lives."[6] Accordingly, Belmont Abbey College believes, with the Catholic Church, that "[t]o use this divine gift while depriving it, even if only partially, of its meaning and purpose, is equally repugnant to the nature of man and of woman, and is consequently in opposition to the plan of God and His holy will." *Id.* Therefore, Belmont Abbey College believes and teaches that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation—whether as an end or as a means"—including contraception and sterilization—is a grave sin.

32. Because of its religious convictions concerning the sanctity of life, Belmont Abbey College cannot participate in any scheme to facilitate access to drugs and services that cause abortions, sterilizations, or deliberately prevent a pregnancy.

33. Belmont Abbey College has approximately 1,600 students.

34. Belmont Abbey College has approximately 200 full-time and 130 part-time employees.

35. As part of its commitment to Catholic education, in accordance with Catholic social teaching, Belmont Abbey College also promotes the well-being and health of its students and employees.  This includes provision of on-campus health services for its students and employees.

---

[6]  Pope Paul VI, Humanae Vitae (1968), http://www.vatican.va/holy_father/paul_vi/ encyclicals/documents/hf_p-vi_enc_25071968_humanae-vitae_en.html.

36. Also as a part of this religious commitment, Belmont Abbey College provides insurance policies to its full-time faculty and staff.

37. As part of its religious commitment, Belmont Abbey College ensures that its insurance policies do not cover drugs, devices, services or procedures inconsistent with its faith. In particular, its insurance plans do not cover sterilization, contraception, or abortion.

38. Belmont Abbey College's religious beliefs prohibit it from deliberately providing insurance coverage for drugs, devices, services or procedures inconsistent with its faith—in particular, sterilization, contraception, or abortion.

39. Nor would Belmont Abbey College's religious beliefs permit it to deliberately provide health insurance that would facilitate access to sterilization, contraception, or abortion, or related education and counseling—even if those items are paid for by an insurer or designee and not by Belmont Abbey College.

40. Many of Belmont Abbey College's employees and students choose to work at or attend Belmont Abbey College because they share its religious beliefs and wish to help Belmont Abbey College further its mission. Belmont Abbey College would violate their implicit trust in the organization and detrimentally alter its relationship with them if it were to violate its religious beliefs regarding abortion, sterilization, and contraceptives.

## II.  The Affordable Care Act and Preventive Care Mandate

41. In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act."

42. The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

43. One provision of the Act mandates that any "group health plan" or "health insurance issuer offering group or individual health insurance coverage" must provide coverage for certain preventive care services. 42 U.S.C. § 300gg-13(a).

44. The services required to be covered include medications, screenings, and counseling given an "A" or "B" rating by the United States Preventive Services Task Force;[7] immunizations recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; and "preventive care and screenings" specific to infants, children, adolescents, and women, as to be "provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(1)-(4).

45. The statute specifies that all of these services must be provided without "any cost sharing." 42 U.S.C. § 300gg-13(a).

The Interim Final Rule

46. On July 19, 2010, HHS[8] published an interim final rule imposing regulations concerning the Affordable Care Act's requirement for coverage of preventive services without cost sharing. 75 Fed. Reg. 41726, 41728 (2010).

---

[7] The list of services that currently have an "A" or "B" rating include medications like aspirin for preventing cardiovascular disease, vitamin D, and folic acid; screenings for a wide range of conditions such as depression, certain cancers and sexually-transmitted diseases, intimate partner violence, obesity, and osteoporosis; and various counseling services, including for breastfeeding, sexually-transmitted diseases, smoking, obesity, healthy dieting, cancer, and so forth. *See* U.S. Preventive Services Task Force, USPSTF A and B Recommendations, http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm (last visited Nov. 19, 2013) (Ex. A); *see also* 75 Fed. Reg. 41726, 41740 (2010).

[8] For ease of reading, references to "HHS" in this Complaint refer to all Defendants, unless context indicates otherwise.

47.   The interim final rule was enacted without prior notice of rulemaking or opportunity for public comment, because Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions . . . in place until a full public notice and comment process was completed." 75 Fed. Reg. at 41730.

48.   Although Defendants suggested in the Interim Final Rule that they would solicit public comments after implementation, they stressed that "provisions of the Affordable Care Act protect significant rights" and therefore it was expedient that "participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities." *Id.*

49.   Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments. *Id.*

50.   In addition to reiterating the Affordable Care Act's preventive services coverage requirements, the Interim Final Rule provided further guidance concerning the Act's restriction on cost sharing.

51.   The Interim Final Rule makes clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries. 75 Fed. Reg. at 41730.

52.   The Interim Final Rule acknowledges that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees." *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums.")

53.   In other words, the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population." 75 Fed. Reg. at 41730.

54.   After the Interim Final Rule was issued, numerous commenters warned against the potential conscience implications of requiring religious individuals and organizations to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

55.   HHS directed a private health policy organization, the Institute of Medicine (IOM), to make recommendations regarding which drugs, procedures, and services should be considered in comprehensive guidelines for preventive care for women.

56.   IOM was not tasked with making insurance coverage recommendations and explicitly excluded cost considerations and other considerations relevant to coverage recommendations from its determinations regarding effective preventive care for women.

57.   In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

58.   No religious groups or other groups that opposed government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

59.   On July 19, 2011, the IOM published its preventive care guidelines for women, including a recommendation that preventive services include all "Food and Drug Administration

approved contraceptive methods [and] sterilization procedures." Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, at 102-10 and Recommendation 5.5 (2011).

60.   FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices such as IUDs; Plan B (also known as the "morning-after pill"); ulipristal (also known as "ella" or the "week-after pill"); and other drugs, devices, and procedures.

61.   Some of these drugs and devices—including the "emergency contraceptives" Plan B and ella and certain IUDs—are known abortifacients, in that they can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

62.   Indeed, the FDA's own Birth Control guide states that both Plan B and ella can work by "preventing attachment (implantation) to the womb (uterus)."[9]

63.   On August 1, 2011, thirteen days after IOM issued its recommendations, HRSA issued guidelines adopting them in full.[10]

The "Religious Employers" Exemption

64.   That same day, HHS promulgated an additional Interim Final Rule. 76 Fed. Reg. 46621 (published Aug. 3, 2011).

65.   This Second Interim Final Rule granted HRSA "*discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46621, 46623 (emphasis added). The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the

---

[9] FDA, Birth Control: Medicines to Help You, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm (last visited Nov. 19, 2013) (Ex. B).

[10] HRSA, Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines (last visited Nov. 19, 2013) (Ex. C).

religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

66. The fourth of these requirements refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order." 26 U.S.C.A. § 6033.

67. Thus, the "religious employers" exemption was severely limited to formal churches, their integrated auxiliaries, and religious orders whose purpose is to inculcate faith and that hire and serve primarily people of their own faith tradition.

68. HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guidelines. The footnote states that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers." [11]

69. Although religious organizations like Belmont Abbey College share the same religious beliefs and concerns as objecting churches, their integrated auxiliaries, and objecting religious orders—including the order of Benedictine monks that sponsors Belmont Abbey College—HHS deliberately ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. at 46623.

70. Thus, thousands of religious organizations that cannot comply with the mandate for religious reasons were excluded from the "religious employers" exemption.

---

[11] HRSA, Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines.

71.   Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or opportunity for public comment.

72.   Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance. 76 Fed. Reg. at 46624.

73.   Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employers" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations.

74.   HHS did not take into account the concerns of religious organizations in the comments submitted before the Second Interim Rule was issued.

75.   Instead the Second Interim Rule was unresponsive to the concerns, including claims of statutory and constitutional conscience rights, stated in the comments submitted by religious organizations.

The Safe Harbor

76.   The public outcry for a broader religious employer exemption continued for many months and, on January 20, 2013, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law."[12]

---

[12] Press Release, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (Jan. 20, 2012), http://www.hhs.gov/news/press/2012pres/01/20120120a.html (Ex. D).

77.   On February 10, 2012, HHS formally announced a "safe harbor" for non-exempt nonprofit religious organizations that objected to covering free contraceptive and abortifacient services. HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (Feb. 10, 2012); *see also* HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (Aug. 15, 2012) (changing the safe harbor eligibility criteria).

78.   Under the safe harbor, HHS agreed it would not take any enforcement action against an eligible organization during the safe harbor, which would remain in effect until the first plan year beginning on or after August 1, 2013. HHS later extended the safe harbor to the first plan year beginning on or after January 1, 2014. HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (June 28, 2013).

79.   HHS also indicated it would develop and propose changes to the regulations to accommodate the objections of non-exempt, nonprofit religious organizations following August 1, 2013.

80.   Despite the safe harbor and HHS's accompanying promises, on February 15, 2012, HHS published a final rule "finaliz[ing], without change," the contraception and abortifacient mandate and narrow religious employers exemption. 77 Fed. Reg. 8725-01 (published Feb. 15, 2012).

The Advance Notice of Proposed Rulemaking

81.   On March 21, 2012, HHS issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain

the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. 77 Fed. Reg. 16501, 16503 (2012).

82. The ANPRM conceded that forcing religious organizations to "contract, *arrange*, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests." *Id*. (emphasis added).

83. In vague terms, the ANPRM proposed that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing." *Id*.

84. For self-insured plans, the ANPRM suggested that third party plan administrators "assume this responsibility." *Id*.

85. For the first time, and contrary to the earlier definition of "cost sharing," Defendants suggested in the ANPRM that insurers and third party administrators could be prohibited from passing along their costs to the objecting religious organizations via increased premiums. *See id*.

86. "[A]pproximately 200,000 comments" were submitted in response to the ANPRM. 78 Fed. Reg. 8456, 8459 (published February 6, 2013). Many of these comments reiterated previous comments that the ANPRM's proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to religiously-objectionable drugs and services.

The Notice of Proposed Rulemaking

87. On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456.

88. The NPRM proposed two changes to the then-existing regulations. 78 Fed. Reg. 8456, 8458-59.

89. First, it proposed revising the religious employers exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith. 78 Fed. Reg. at 8461

90. Under this proposal a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or [](iii) of the Internal Revenue Code." 78 Fed. Reg. at 8474.

91. HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. at 8461.

92. In other words, religious organizations like Belmont Abbey College that are not formal churches would continue to be excluded from the exemption.

93. Second, the NPRM reiterated HHS's intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

94. The proposed "accommodation" did not resolve the concerns of religious organizations like Belmont Abbey College because it continued to force them to deliberately provide health insurance and take actions that would trigger access to religiously-objectionable drugs and related education and counseling.

95. In issuing the NPRM, HHS requested comments from the public by April 8, 2013. 78 Fed. Reg. at 8457.

96. "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871 (published July 2, 2013), with religious organizations again overwhelmingly decrying the proposed accommodation as a gross violation of their religious liberty because it

would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

97.  Belmont Abbey College submitted comments on the NPRM, stating essentially the same objections stated in this complaint.

98.  On April 8, 2013, the same day the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

99.  In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.[13]

100. It is clear from the timing of these remarks that Defendants gave no consideration to the comments submitted in response to the NPRM's proposed "accommodation."

<u>The Final Mandate</u>

101. On June 28, 2013, Defendants issued a final rule (the "Final Mandate"), which ignores the objections repeatedly raised by religious organizations and continues to co-opt objecting religious employers into the government's scheme of expanding free access to contraceptive and abortifacient services. 78 Fed. Reg. 39870.

---

[13] The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, http://theforum.sph.harvard. edu/events/conversation-kathleen-sebelius (last visited Nov. 19, 2013) (from 51:20 to 53:56) (emphases added) (Ex. E). A permanent link to the relevant section of Sec. Sebelius' remarks is available here: http://www.youtube.com/watch?v=py6aSwQl-2g&feature=youtu.be (last visited Nov. 19, 2013).

102. Under the Final Mandate, the discretionary "religious employers" exemption, which is still implemented via footnote on the HRSA website, Ex. C, remains limited to formal churches and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39874.

103. All other religious organizations, including Belmont Abbey College, are excluded from the exemption.

104. The Final Mandate creates a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874.

105. An organization is eligible for the accommodation if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

106. The self-certification must be executed "prior to the beginning of the first plan year to which an accommodation is to apply." 78 Fed. Reg. at 39875.

107. The Final Rule extends the current safe harbor through the end of 2013. 78 Fed. Reg. at 39889; *see also* HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (June 28, 2013) (extending the safe harbor to the first plan year that begins on or after January 1, 2014).

108. Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer or, if the organization has a self-insured plan, to the plan's third party administrator. 78 Fed. Reg. at 39875.

109. By the terms of the accommodation, Belmont Abbey College will be required to execute the self-certification and deliver it to its insurer before December 1, 2014.

110. By delivering its self-certification to its insurer, Belmont Abbey College would trigger the insurer's obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries." 78 Fed. Reg. at 39875-76.

111. Belmont Abbey College would have to identify its employees to the insurer for the distinct purpose of enabling the government's scheme to facilitate free access to contraceptive and abortifacient services.

112. The insurer's obligation to make direct payments for contraceptive and abortion services would continue only "for so long as the participant or beneficiary remains enrolled in the plan." 78 Fed. Reg. at 39876.

113. Thus Belmont Abbey College would have to coordinate with its insurer regarding when it was adding or removing employees and beneficiaries from its healthcare plan and, as a result, from the contraceptive, sterilization, and abortifacient services payment scheme.

114. Insurers would be required to notify plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan. 78 Fed. Reg. at 39876.

115. This would also require Belmont Abbey College to coordinate the notices with its insurer.

116. The insurer would be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77.

117.  Thus, any payment or coverage disputes presumably would be resolved under the terms of Belmont Abbey College's existing plan documents.

118.  Thus, even under the accommodation, Belmont Abbey College and every other non-exempt objecting religious organization would continue to play a central role in facilitating free access to contraceptive, sterilization, and abortifacient services.

119.  Under the accommodation, issuers "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), *or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly*, on the eligible organization." 78 Fed. Reg. at 39896 (emphasis added).

120.  For all other preventive services, including non-contraceptive preventive services for women, only cost-sharing (*i.e.*, out-of-pocket expense) is prohibited. There is no restriction on passing along costs via premiums or other charges.

121.  Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive and abortifacient services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." 78 Fed. Reg. at 39877.

122.  On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

123.  Nevertheless, even if the payments were—over time—to become cost neutral, it is undisputed that there will be up-front costs for making the payments. *See, e.g.,* 78 Fed. Reg. at 39877-78 (addressing ways insurers can cover up-front costs).

124.  Moreover, if cost savings arise that make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers.

125.  HHS suggests that, to maintain cost neutrality, issuers may simply ignore this fact and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants." 78 Fed. Reg. at 39877.

126.  This encourages issuers to artificially inflate the eligible organization's premiums.

127.  Under this methodology—even assuming its legality—the eligible organization would still bear the cost of the required payments for contraceptive, sterilization, and abortifacient services in violation of its conscience, as if the accommodation had never been made.

128.  Defendants have suggested that "[a]nother option" would be to "treat the cost of payments for contraceptive services . . . as an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations." 78 Fed. Reg. at 39878.

129.  There is no legal authority for forcing third parties to pay for services provided to eligible organizations under the accommodation.

130.  Furthermore, under the Affordable Care Act, Defendants lack authority in the first place to coerce insurers to directly purchase contraceptive, sterilization, and abortifacient services for an eligible organization's plan participants and beneficiaries.

131.  Thus, the accommodation fails to protect objecting religious organizations for lack of statutory authority.

132.  Currently, Belmont Abbey College is insured through Blue Cross Blue Shield of North Carolina. Because Belmont Abbey College would be required to identify and designate an

insurer willing to administer the contraceptive and abortifacient services, Belmont Abbey College's religious beliefs preclude it from complying with the accommodation.

133.  For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations with insured plans—such as Belmont Abbey College—from being co-opted as the central cog in the government's scheme to expand access to free contraceptive and abortifacient services.

134.  The Final Rule sets forth complex means through which a third party administrator may seek to recover its costs incurred in making payments for contraceptive and abortifacient services.

135.  The third party administrator must identify an issuer who participates in the federal exchanges established under the Affordable Care Act and who would be willing to make payments on behalf of the third party administrator.

136.  Cooperating issuers would then be authorized to obtain refunds from the user fees they have paid to participate in the federal exchange as a means of being reimbursed for making payments for contraceptive and abortifacient services on behalf of the third party administrator.

137.  Issuers would be required to pay a portion of the refund back to the third party administrator to compensate it for any administrative expenses it has incurred.

138.  These extreme machinations, ostensibly employed only to shift the *cost* of the Final Mandate, are severely flawed.

139.  There is no way to ensure that the cost of administering the contraceptive and abortifacient services would not be passed on to religious organizations through the third party administrator's fees.

140.  Moreover, taking the user fees intended for funding the federal exchanges and using them to provide contraceptive and abortifacient services to employees not participating in the federal exchanges would violate the statute authorizing the user fees. *See* 78 Fed. Reg. 15410, 15412 (published March 11, 2013); 31 U.S.C. § 9701.

141.  In sum, for both insured organizations like Belmont Abbey College and self-insured organizations, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for expanding access to contraceptive and abortifacient services.

142.  Despite the accommodation's convoluted machinations, a religious organization's decision to offer health insurance and its self-certification continue to serve as the sole triggers for creating access to free contraceptive and abortifacient services.

143.  Belmont Abbey College cannot participate in or facilitate the government's scheme in this manner without violating its religious convictions.

<u>Belmont Abbey College's Health Care Plan and Its Religious Objections</u>

144.  The plan year for Belmont Abbey College's employee healthcare plan begins on December 1 of each year.

145.  Belmont Abbey College's employee health care plan is an insured plan issued by Blue Cross Blue Shield of North Carolina.

146.  Thus, beginning on or about December 1, 2014, Belmont Abbey College faces the choice of either including free coverage for contraceptive and abortifacient services in its employee health plan or else forcing its insurer to provide the exact same services.

147. Belmont Abbey College has no objection to including, and already does include, free coverage for women's preventive services such as mammograms. It also has no conscientious

objection to providing access to drugs typically used for contraception when they are instead used for purely medical reasons unrelated to birth control, such as treating ovarian cysts.

148.   However, Belmont Abbey College's religious convictions forbid it from including free coverage for abortifacient, sterilization, or contraceptive services in any of its healthcare plans.

149.   Belmont Abbey College's religious convictions equally forbid it from hiring or designating its insurer to provide free access to abortifacient, sterilization, or contraceptive services.

150.   From Belmont Abbey College's perspective, forcing its insurance issuer to provide free access to abortifacient, sterilization, or contraceptive services is no different than directly providing that access.

151.   Belmont Abbey College's religious convictions forbid it from participating in any way in the government's scheme to promote and provide free access to abortifacient, sterilization, or contraceptive services through Belmont Abbey College's health care plans.

152.   Belmont Abbey College is not eligible for the religious employers exemption because it is not an organization "described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

153.   Belmont Abbey College's current employee health insurance plan has changed significantly after March 23, 2010 and has never included the statements regarding grandfathered status required under federal law.

154.   Belmont Abbey's employee healthcare plan does not meet the definition of a "grandfathered" plan. *See* 45 C.F.R. § 147.140(a)(1)(i); 26 C.F.R. § 54.9815-1251T(a)(1)(i); 29 C.F.R. § 2590.715-1251(a)(1)(i).

155.  Because Belmont Abbey College is unable to comply with the Final Mandate because of its religious beliefs, and because it is unable to force its insurer to carry out the Final Mandate by submitting a self-certification, it faces crippling fines of $100 each day, for "each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

156.  Dropping its insurance plans would unfairly and severely burden Belmont Abbey College's employees, and would place Belmont Abbey College at a severe competitive disadvantage in its efforts to recruit and retain employees.

157.  Belmont Abbey College would also face fines of $2000 per year for each of its employees for dropping its insurance plans.

158.  Although the government has recently announced that it will postpone implementing the annual fine of $2000 per employee for organizations that drop their insurance altogether, the postponement is only for one year, until 2015. This postponement does not delay the crippling daily fines under 26 U.S.C. § 4980D.

159. Belmont Abbey College's Catholic faith compels it to promote the spiritual and physical well-being of its employees by providing them with generous health services.

160.  The Final Mandate forces Belmont Abbey College to violate its religious beliefs or incur substantial fines for either excluding objectionable coverage without forcing its insurance issuer to provide the same coverage, or terminating its employee health insurance coverage altogether.

161.  The Final Mandate forces Belmont Abbey College to deliberately provide health insurance that would facilitate free access to abortifacient, sterilization, or contraceptive services regardless of the ability of insured persons to obtain these drugs and services from other sources.

162.  The Final Mandate forces Belmont Abbey College to facilitate government-dictated education and counseling concerning abortion, sterilization, and contraceptive use that are incompatible with its religious beliefs and teachings.

163.  Facilitating this government-dictated speech is incompatible and irreconcilable with the express speech and messages concerning the sanctity of life and sexuality that Belmont Abbey College seeks to convey.

The Lack of a Compelling Government Interest

164.  The government lacks any compelling interest in coercing Belmont Abbey College to facilitate access to abortifacient, sterilization, or contraceptive services.

165.  The required abortifacient, sterilization, or contraceptive drugs, devices, and related services are already widely available at non-prohibitive costs.

166.  There are multiple ways in which the government could provide access without co-opting religious employers and their insurance plans in violation of their religious beliefs.

167.  For example, it could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct government payments, or through tax deductions, refunds, or credits.

168.  The government could also simply exempt all religious organizations, just as it has already exempted nonprofit religious employers referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

169.  HHS claims that its "religious employers" exemption does not undermine its compelling interest in making contraceptive and abortifacient services available for free to women because "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of

the same faith and/or adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39887.

170. Belmont Abbey College's employees commit to further its mission of being a distinctively Catholic and Benedictine institution, including its mission of communicating Catholic beliefs concerning the sanctity of life and sexuality.

171. Because of Belmont Abbey College's religious obligation under *Ex Corde Ecclesiae* to proclaim Catholic teaching regarding the sanctity of life and sexuality, many of the students and employees that have chosen to join the Belmont Abbey College community are just as likely as employees of exempt organizations to adhere to the same values, and thus are less likely than other people to use the objectionable drugs, devices, and services.

172. In one form or another, the government also provides exemptions for grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41726, 41731 (2010), small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A), and certain religious denominations, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

173. These broad exemptions further demonstrate that the government has no compelling interest in refusing to include religious organizations like Belmont Abbey College within its religious employers exemption.

174. Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

175.  Indeed, HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of medium-sized employers with between 50 and 100 employees may do likewise. 75 Fed. Reg. 34538 (published June 17, 2010).[14]

176.  According to the United States census, more than 20 million individuals are employed by firms with fewer than 20 employees.[15]

177.  It is reasonable to presume that millions more are employed by firms with between 20 and 50 employees.

178.  The government's recent decision to postpone the employer mandate—i.e., the annual fine of $2000 per employee for not offering any insurance—also demonstrates that there is no compelling interest in coercing universal compliance with the Final Mandate concerning contraceptive and abortifacient services, since employers can now simply drop their insurance without any penalty, at least for one additional year.

179.  These broad exemptions also demonstrate that the Final Mandate is not a generally applicable law entitled to judicial deference, but rather is constitutionally flawed.

180.  The government's willingness to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations also shows that the Final Mandate is not neutral, but

---

[14]  *See also* Centers for Medicare & Medicaid Services, Amendment to Regulation on "Grandfathered" Health Plans under the Affordable Care Act, https://www.cms.gov/ CCIIO/Resources/Files/factsheet_grandfather_amendment.html (noting that amendment to regulations "will result in a small increase in the number of plans retaining their grandfathered status relative to the estimates made in the grandfathering regulation") (last visited Nov. 19, 2013) (Ex. F).

[15]  U.S. Census Bureau, Statistics About Business Size, http://www.census.gov/econ/ smallbus.html (last visited Nov. 19, 2013) (Ex. G).

rather discriminates against religious organizations because of their religious commitment to promoting the sanctity of life.

181.  Indeed, the Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose Belmont Abbey College's religious teachings and beliefs regarding marriage and family.

182.  Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

183.  On October 5, 2011, six days after the comment period for the original interim final rule ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war."[16]

184.  She further criticized individuals and entities whose beliefs differed from those held by her and the others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

185.  On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to people who opposed civil rights legislation in the 1960s, stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation."[17]

186.  Consequently, on information and belief, Belmont Abbey College alleges that the purpose of the Final Mandate, including the restrictively narrow scope of the religious employers

---

[16] William McGurn, *The Church of Kathleen Sebelius*, Wall St. J., Dec. 13, 2011, *available at* http://online.wsj.com/news/articles/SB10001424052970203518404577094631979925326   (Ex. H).

[17] *See* Kathleen Sebelius, Remarks at the 104th NAACP Annual Conference, July 16, 2013, http://www.hhs.gov/secretary/about/speeches/sp20130716.html (Ex. I).

exemption, is to discriminate against religious organizations that oppose contraception and abortion.

**CLAIMS**

**COUNT I**

**Violation of the Religious Freedom Restoration Act**
**Substantial Burden**

187.  Belmont Abbey College incorporates by reference all preceding paragraphs.

188.  Belmont Abbey College's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to contraception, sterilization, abortion, or related education and counseling. Belmont Abbey College's compliance with these beliefs is a religious exercise.

189.  The Final Mandate creates government-imposed coercive pressure on Belmont Abbey College to change or violate its religious beliefs.

190.  The Final Mandate chills the Belmont Abbey College's religious exercise.

191.  The Final Mandate exposes Belmont Abbey College to substantial fines for its religious exercise.

192.  The Final Mandate exposes Belmont Abbey College to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

193.  The Final Mandate imposes a substantial burden on Belmont Abbey College's religious exercise.

194.  The Final Mandate furthers no compelling governmental interest.

195.  The Final Mandate is not narrowly tailored to any compelling governmental interest.

196.  The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

197. The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate Belmont Abbey College's rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

198. Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

**COUNT II**

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Burden**

199. Belmont Abbey College incorporates by reference all preceding paragraphs.

200. Belmont Abbey College's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to contraception, sterilization, abortion, or related education and counseling. Belmont Abbey College's compliance with these beliefs is a religious exercise.

201. Neither the Affordable Care Act nor the Final Mandate is neutral.

202. Neither the Affordable Care Act nor the Final Mandate is generally applicable.

203. Defendants have created categorical exemptions and individualized exemptions to the Final Mandate.

204. The Final Mandate furthers no compelling governmental interest.

205. The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

206. The Final Mandate creates government-imposed coercive pressure on Belmont Abbey College to change or violate its religious beliefs.

207. The Final Mandate chills Belmont Abbey College's religious exercise.

208.  The Final Mandate exposes Belmont Abbey College to substantial fines for its religious exercise.

209.  The Final Mandate exposes Belmont Abbey College to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

210.  The Final Mandate imposes a burden on Belmont Abbey College's religious exercise.

211.  The Final Mandate is not narrowly tailored to any compelling governmental interest.

212.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate Belmont Abbey College's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

213.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT III

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause
### Intentional Discrimination

214.  Belmont Abbey College incorporates by reference all preceding paragraphs.

215.  Belmont Abbey College's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to contraception, sterilization, abortion, or related education and counseling. Belmont Abbey College's compliance with these beliefs is a religious exercise.

216.  Despite being informed in detail of these beliefs beforehand, Defendants designed the Final Mandate and the religious employer exemption to the Final Mandate to target religious organizations like Belmont Abbey College because of their religious beliefs.

217.  Defendants promulgated both the Final Mandate and its religious employer exemption in order to suppress the religious exercise of Belmont Abbey College and others.

218.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate Belmont Abbey College's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

219.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT IV

**Violation of the First Amendment to the United States Constitution**
**Free Exercise and Establishment Clauses**
**Discrimination Among Religions and Religious Institutions**

220.  Belmont Abbey College incorporates by reference all preceding paragraphs.

221.  The Free Exercise Clause and Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

222.  This mandate of equal treatment protects organizations as well as individuals.

223.  The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions and religious institutions on the basis of religious views or religious status.

224.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate Belmont Abbey College's rights secured to it by the First Amendment of the United States Constitution.

225.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT V

**Violation of the First Amendment to the United States Constitution**
**Selective Burden (*Larson* v. *Valente*)**

226.  Belmont Abbey College incorporates by reference all preceding paragraphs.

227.  By design, defendants imposed the Final Mandate on some religious organizations but not on others, resulting in a selective burden on Belmont Abbey College.

228.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate Belmont Abbey College's rights secured to it by the First Amendment of the United States Constitution.

229.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

230.  The Final Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

## COUNT VI

### Interference in Matters of Internal Religious Governance
### Free Exercise Clause and Establishment Clause

231.  Belmont Abbey College incorporates by reference all preceding paragraphs.

232.  The Free Exercise Clause and the Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of internal governance as well as those of faith and doctrine.

233.  Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, leadership, or doctrine.

234.  Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

235.  Belmont Abbey College has made an internal decision, dictated by its Christian faith, that any health plans it makes available to its employees may not subsidize, provide, or facilitate access to abortifacient, sterilization, or contraceptive drugs, devices, or related services.

236. The Final Mandate interferes with Belmont Abbey College's internal decisions concerning its structure and mission by requiring it to subsidize, provide, and facilitate practices that directly conflict with its Christian beliefs

237. The Final Mandate's interference with Belmont Abbey College's internal decisions affects its faith and mission by requiring it to subsidize, provide, and facilitate practices that directly conflict with its religious beliefs.

238. Because the Final Mandate interferes with Belmont Abbey College's internal decision making in a manner that affects its faith and mission, it violates the Establishment Clause and Free Exercise Clause of the First Amendment.

Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT VII

### Religious Discrimination
### Violation of the First and Fifth Amendments to the United States Constitution
### Establishment Clause and Due Process

239. Belmont Abbey College incorporates by reference all preceding paragraphs.

240. By design, defendants imposed the Final Mandate on some religious organizations but not on others, resulting in discrimination among religious objectors.

241. Religious liberty is a fundamental right.

242. The "religious employer" exemption protects many religious objectors, but not Belmont Abbey College.

243. The "accommodation" provides no meaningful protection for Belmont Abbey College.

244. The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate Belmont Abbey College's rights secured to it by the Establishment Clause of

the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

245. Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT VIII

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

246. Belmont Abbey College incorporates by reference all preceding paragraphs.

247. The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

248. This mandate of equal treatment protects organizations as well as individuals.

249. The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

250. The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate Belmont Abbey College's rights secured to it by the Fifth Amendment of the United States Constitution.

251. Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT IX

**Violation of the First Amendment to the United States Constitution
Freedom of Speech
Compelled Speech and Compelled Silence**

252. Belmont Abbey College incorporates by reference all preceding paragraphs.

253. Belmont Abbey College teaches that contraception, sterilization, and abortion violate its religious beliefs.

254.  The Final Mandate would compel Belmont Abbey College to subsidize activities that Belmont Abbey College teaches are violations of Belmont Abbey College's religious beliefs.

255.  The Final Mandate would compel Belmont Abbey College to provide education and counseling related to contraception, sterilization, and abortion.

256.  Defendants' actions thus violate Belmont Abbey College's right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

257.  If Belmont Abbey College chose to use a third-party administrator, the Final Mandate also prevents Belmont Abbey College from speaking to that administrator about its religious beliefs and preference that the administrator not provide the services at issue.

258.  The Final Mandate's speech restrictions are not narrowly tailored to a compelling governmental interest.

259.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment to the United States Constitution
Freedom of Speech
Expressive Association**

260.  Belmont Abbey College incorporates by reference all preceding paragraphs.

261.  Belmont Abbey College teaches that contraception, sterilization, and abortion violate its religious beliefs.

262.  The Final Mandate would compel Belmont Abbey College to facilitate activities that Belmont Abbey College teaches are violations of Belmont Abbey College's religious beliefs.

263. The Final Mandate would compel Belmont Abbey College to facilitate access to government-dictated education and counseling related to contraception, sterilization, and abortion.

264. Defendants' actions thus violate Belmont Abbey College's right of expressive association as secured to it by the First Amendment of the United States Constitution.

265. Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT XI

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause and Freedom of Speech
Unbridled Discretion**

266. Belmont Abbey College incorporates by reference all preceding paragraphs.

267. By stating that HRSA "may" grant an exemption to certain religious groups, the Final Mandate vests HRSA with unbridled discretion over which organizations can have its First Amendment interests accommodated.

268. Defendants have exercised unbridled discretion in a discriminatory manner by granting an exemption via footnote in a website for a narrowly defined group of "religious employers" but not for other religious organizations like Belmont Abbey College.

269. Defendants have further exercised unbridled discretion by indiscriminately waiving enforcement of some provisions of the Affordable Care Act while refusing to waive enforcement of the Final Mandate, despite its conflict with the free exercise of religion.

270. Defendants' actions therefore violate Belmont Abbey College's right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

271.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT XII

### Violation of the Administrative Procedure Act
### Lack of Good Cause and Improper Delegation

272.  Belmont Abbey College incorporates by reference all preceding paragraphs.

273.  The Affordable Care Act expressly delegates to HRSA, an agency within Defendant HHS, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

274.  Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover. Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

275.  Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law. Defendants, instead, wholly delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

276.  The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend. The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

277.  Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

278.  Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

279.  Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

280.  Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented."

281.  Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule or the NPRM.

282.  Therefore, Defendants have taken agency action not in observance with procedures required by law, and Belmont Abbey College is entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

283.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT XIII

**Violation of the Administrative Procedure Act
Arbitrary and Capricious Action**

284.  Belmont Abbey College incorporates by reference all preceding paragraphs.

285.  In promulgating the Final Mandate, Defendants failed to consider the constitutional and statutory implications of the Final Mandate on Belmont Abbey College and similar organizations.

286.  Defendants' explanation for its decision not to exempt Belmont Abbey College and similar religious organizations from the Final Mandate runs counter to the evidence submitted by religious organizations during the comment period.

41

287.  Defendant Secretary Sebelius, in remarks made at Harvard University on April 8, 2013, essentially conceded that Defendants completely disregarded the religious liberty concerns submitted by thousands of religious organizations and individuals.

288.  Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and they do not take into consideration the evidence against them.

289.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT XIV

### Violation of the Administrative Procedure Act
### Agency Action Without Statutory Authority

290.    Belmont Abbey College incorporates by reference all preceding paragraphs.

291.  Defendant's authority to enact regulations under the Affordable Care Act is limited to the authority expressly granted them by Congress.

292.  Defendants lack statutory authority to coerce insurance issuers and third party administrators to pay for contraceptive and abortifacient services for individuals with whom they have no contractual or fiduciary relationship.

293.  Defendants lack statutory authority to prevent insurance issuers and third party administrators from passing on the costs of providing contraceptive and abortifacient services via higher premiums or other charges that are not "cost sharing."

294.  Defendants lack statutory authority to allow user fees from the federal exchanges to be used to purchase contraceptive and abortifacient services for employees not participating in the exchanges.

295. Because the Final Mandate's "accommodation" for non-exempt, nonprofit religious organizations lacks legal authority, it is arbitrary and capricious and provides no legitimate protection of objecting organization's First Amendment rights.

296. Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT XV

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Weldon Amendment**
**Religious Freedom Restoration Act**
**First Amendment to the United States Constitution**

297. Belmont Abbey College incorporates by reference all preceding paragraphs.

298. The Final Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. 110-117, 123 Stat. 3034 (Dec. 16, 2009).[18]

299. The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

---

[18] *Available at* http://www.hhs.gov/ocr/civilrights/understanding/ConscienceProtect/publaw 111_117_123_stat_3034.pdf (Ex. J).

300. The Final Mandate requires issuers, including Belmont Abbey College, to deliberately provide health insurance that facilitates access to all Federal Drug Administration-approved contraceptives.

301. Some FDA-approved contraceptives cause abortions.

302. As set forth above, the Final Mandate violates RFRA and the First Amendment.

303. Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

304. Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## COUNT XVI

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Affordable Care Act**

305. Belmont Abbey College incorporates by reference all preceding paragraphs.

306. The Final Mandate is contrary to the provisions of the Affordable Care Act.

307. Section 1303 of the Affordable Care Act states that "nothing in this title"—*i.e.*, title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

308. Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

309. Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

310.  The Final Mandate requires group health plans, including Belmont Abbey College's, to provide coverage of all Federal Drug Administration-approved contraceptives.

311.  Some FDA-approved contraceptives cause abortions.

312.  Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

313.  Absent injunctive and declaratory relief against the Final Mandate, Belmont Abbey College has been and will continue to be harmed.

## **PRAYER FOR RELIEF**

Wherefore, Belmont Abbey College requests that the Court:

a.  Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against Belmont Abbey College violate the First Amendment of the United States Constitution;

b.  Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against Belmont Abbey College violate the Fifth Amendment of the United States Constitution;

c.  Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against Belmont Abbey College violate the Religious Freedom Restoration Act;

d.  Declare that the Final Mandate was issued in violation of the Administrative Procedure Act;

e.  Issue a permanent injunction prohibiting Defendants from enforcing the Final Mandate against Belmont Abbey College and other organizations that object on religious grounds to providing insurance coverage for contraceptives (including

abortifacient contraceptives), sterilization procedures, and related education and counseling;

f.   Award Belmont Abbey College the costs of this action and reasonable attorney's fees; and

g.   Award such other and further relief as it deems equitable and just.

Respectfully submitted this 20th day of November, 2013.

## JURY DEMAND

Belmont Abbey College requests a trial by jury on all issues so triable.

   *s/ Mark Rienzi*
Mark Rienzi, DC Bar No. 494336
Adèle Auxier Keim, DC Bar No. 989528
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K St. NW, Ste. 220
Washington, DC 20007
(202) 955-0095 (tel.)
(202) 955-0090 (fax)

*Attorneys for Plaintiff*
*Belmont Abbey College*

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on Nov. 19, 2013 in Belmont, NC.

Dr. William Thierfelder
President, Belmont Abbey College